FILED

JAN - 7 2026

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:25-cr-221 |
| DANIEL JOHN BLANEY, | |
| *Defendant.* | |

## STATEMENT OF FACTS

The United States and the defendant, Daniel John Blaney (hereinafter, "the defendant"), agree that the following facts are true and correct, and that had this matter proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1.      Beginning at least in and around May of 2022 and continuing thereafter up to and including June of 2025, the exact dates being unknown, in Arlington, Virginia, within the Eastern District of Virginia, and elsewhere, the defendant, Daniel John Blaney, did knowingly and intentionally conspire with others, including Kenneth Lora, David Kable Jr., Javier Bermudez, and others known and unknown, to distribute:

   a. five hundred grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance;

   b. four hundred grams or more of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly referred to as fentanyl, a Schedule II controlled substance; and

   c. a mixture and substance containing a detectable amount of 2-(4-Ethoxybenzyl)-5-

1

nitro-1-(2- (pyrrolidin-1-yl)ethyl)-1H-benzimidazole, commonly referred to as N-Pyrrolidino Etonitazene, a synthetic opioid and Schedule I controlled substance.

in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(viii), 841(b)(1)(C), and 841(b)(2).

2.      During the course of and in furtherance of the conspiracy, the defendant personally distributed, or it was reasonably foreseeable to him that his co-conspirators distributed, at least 90,000 KG of converted drug weight as defined by Section 2D1.1 of the United States Sentencing Guidelines.

3.      The defendant was part of a conspiracy involving the manufacture and distribution of counterfeit Oxycodone, Adderall, and Xanax pills. However, instead of their pharmaceutical makeup, the conspirators' pilled contained a variety of substances. For example, the counterfeit oxycodone pills contained differing substances depending on the batch, including fentanyl, N-Pyrrolidino Etonitazene, and Xylazine. The counterfeit Adderall pills typically contained Methamphetamine. The counterfeit Xanax pills typically contained Bromazolam, a synthetic benzodiazepine.

4.      The defendant joined the conspiracy at least as early as May of 2022. As set forth below, the defendant's role included the operation of darknet market pages used to distributed controlled substances, the recruitment of coconspirators to operate darknet market pages and distribute controlled substances sold through those pages, the distribution of proceeds amongst conspirators, and oversight over his recruit's sale and distribution of controlled substances.

I.      *The Conspirators' Distribution through Darknet Markets*

5.      The distribution of pills occurred, among other means, through darknet marketplaces ("DMs"), using the vendor aliases TegrityPharma and Simplejack. The defendant

2

and his coconspirators operated through vendor pages on several DM's, including Archetyp, Incognito, Tor2Door, Nemesis, Alpha Bay, Bohemia, Abacus, ASAP, Dream, and White House Markets. In order to operate on these markets, the defendant and his coconspirators created vendor profile pages, which listed items for sale, published descriptions of their products and operation to attract customers, and published customer reviews of their products. The defendant and his coconspirators advertised these pills in quantities between 10 and 10,000 pills per sale. DMs additionally display the number of successful transactions and sales in order to give prospective customers confidence that transactions with a given vendor will proceed without issues. Over 3,700 sales of controlled substances were reflected over just two of the markets used by the conspirators.

6.      Once orders were placed on the pages utilized by the defendant and his coconspirators, they processed the orders on their DMs, packaged controlled substances using methods designed to evade law enforcement detection, and shipped packages containing controlled substances to customers nationwide—including into the Eastern District of Virginia—via the U.S. Postal Service. In exchange, the defendant and his coconspirators typically received payment from customers in the form of cryptocurrency. Archetyp specifically required transactions to be conducted via a particular cryptocurrency, Monero (XMR). Conspirators thereafter distributed proceeds amongst each other using cryptocurrency and other financial transactions, including a fee paid to the operators of the DMs for hosting their page and facilitating transactions.

7.      For a period of time, BLANEY personally ran TEGRITYPHARMA darknet market vendor pages associated with the conspiracy. Eventually, the defendant outsourced management of darknet market vendor pages to others.

8. The defendant's coconspirators were active on Archetyp Market using the TEGRITYPHARMA vendor page specifically since at least September 2023 to June 2025. Throughout this time, coconspirator LORA stored, packaged, and shipped drugs to customers and redistributors in furtherance of the conspiracy. During that time period, sales data published by Archetyp market indicated that the conspirators completed at least 1,000 sales of illegal narcotics, including counterfeit Adderall, Xanax, and Oxycodone. Customer reviews for these products were publicized on the TegrityPharma DM pages and listed for each review the product and quantity purchased. A law enforcement analysis of reviews spanning from November 15, 2024, to April 29, 2025 of the TegrityPharma Archetyp Market DM page revealed at least 350 customer reviews in that time period for over 112,000 counterfeit Adderall pills and over 10,000 counterfeit Oxycodone pills. Among various positive reviews and complaints, customers informed individuals, including the defendant, who accessed the TEGRITYPHARMA page that fentanyl was present in the pills they distributed. For example, at least one customer reported they had tested the counterfeit oxycodone pills for fentanyl, which tested positive, warning others "DON'T BUY UNLESS U WANT FENT."

## II. *Distribution of Proceeds of the Conspiracy*

9. Because proceeds of the conspiracy flowed in throw the darknet market vendor pages, the individuals who operated the pages thereafter periodically provided the defendant with the proceeds of the conspiracy, less their cut for operating the vendor pages. The defendant utilized multiple forms of financial transactions to receive payment, including cryptocurrency, cash, CashApp, gift cards, and other means. For example, financial analysis revealed the defendant received proceeds of the Simplejack page via CashApp.

4

10.     After receiving proceeds, the defendant distributed proceeds to multiple other conspirators as payment for their roles in the conspiracy, at times through convoluted transactions. On numerous occasions, the defendant paid KABLE and/or BERMUDEZ, who in turn provided payment to LORA. For example, during the ten-month period between February and December 2024, BERMUDEZ distributed over $54,000 in drug proceeds to LORA via the person-to-person money transfer system Zelle. At times, LORA was paid in cryptocurrency. For example, between January and April 2025, LORA received over $17,000 USD via cryptocurrency transfers via his PayPal account.

11.     Cryptocurrency analysis of the transaction in which LORA received cryptocurrency revealed among other things, that one wallet that funded payments to LORA also sent approximately $7,040 USD worth of cryptocurrency to a China-based company that has been associated with the distribution of precursor chemicals and opioids into the United States. This importation of controlled substances was completed at the defendant's direction.

### III.   *Transport of Controlled Substances from Massachusetts to New York for Redistribution*

12.     Beginning in or around at least January 2023, at the defendant's direction, LORA moved from Massachusetts to New York in order to distribute drugs in furtherance of the conspiracy from New York. Between January 2023 and June 2025, LORA resided at numerous temporary-stay residences that he rented, a primary purpose of which was to store and package drugs in furtherance of the drug distribution conspiracy. LORA stored kilogram quantities of controlled substances at his residences. He further received orders from conspirators at his premises, from which he printed shipping labels and packaged controlled substances for distribution by him to customers and redistributors. During the conspiracy period, LORA

5

periodically moved residences to evade law enforcement detection, staying at at least 12 different residences between January 2023 and June 2025.

13.    LORA periodically received delivery of controlled substances from conspirators, which he then stored at his residences for further distribution and received payment from conspirators to support his rent at his temporary residences. Among others, BERMUDEZ and KABLE each delivered controlled substances to LORA on multiple occasions. Typically, the defendant directed BERMUDEZ and KABLE where to receive controlled substances from conspirators, after which they travelled by vehicle to transport kilogram quantities of controlled substances received from Massachusetts to New York. The controlled substances were typically stored in large black bins with yellow and red lids. At times, BERMUDEZ and KABLE travelled together to deliver controlled substances to LORA in New York. Other times, BERMUDEZ and KABLE each travelled alone to do so.

14.    The defendant paid BERMUDEZ and KABLE hundreds of dollars per trip for transporting controlled substances to LORA in New York. Though KABLE had his own vehicle, KABLE and BERMUDEZ at times rented vehicles to transport to drugs to LORA. The defendant typically provided the funds for the rental vehicles.

15.    BERMUDEZ, KABLE, LORA, and the defendant used encrypted communication applications to communicate with each other about their drug-trafficking activities. For example, the defendant and others communicated with LORA via an encrypted messaging application as well as an encrypted email service to convey orders and shipping labels for controlled substances. LORA typically would message the defendant, BERMUDEZ, and others via an encrypted communication platform when he needed to be resupplied with controlled substances.

#### IV.    *Shipping of Controlled Substances via the U.S. Mail from New York*

16.    The defendant and others sent instructions for darknet market orders to be fulfilled to LORA via an encrypted email address. LORA fulfilled orders for both the TEGRITYPHARMA and Simplejack vendor pages. Each email typically contained several customer orders, with law enforcement identifying up to 40 orders conveyed to LORA at a single time. These orders ranged in quantities of controlled substances to be shipped by LORA, with some emails directing LORA to ship as much as 10,000 and 15,000 pills. Once LORA received lists of orders from his coconspirators, LORA typically assembled packages for the orders placed and then personally placed those packages into the mail stream by depositing them at U.S. post offices. LORA held no employment during the conspiracy and often travelled multiple times per week to post offices to deposit multiple drug-laden packages at a time.

17.    LORA at times himself obtained the materials to package and ship controlled substances and typically packaged drugs within multiple layers of material to avoid detection. During the conspiracy period, LORA purchased at least 9,500 mailing labels; 56 ink cartridges; 13 boxes of nitrile gloves; 68 rolls of heavy-duty shipping tape; 8,400 vacuum sealer bags; 8,400 mylar bags; and 7,000 bubble mailer-style shipping bags to package controlled substances.

18.    To avoid law enforcement detection, LORA, the defendant, and their co-conspirators used true company names and return addresses on the packages they shipped, though they were not affiliated with the listed entities and addresses. LORA also utilized multiple post offices to deposit drug-laden packages.

19.    Further, LORA on multiple occasions changed residences, which was where he stored kilogram-level quantities of narcotics pending distribution. Within a 12-month period, LORA was observed by law enforcement residing at least four different locations. When LORA

7

changed residences, KABLE and/or BERMUDEZ typically travelled to New York to assist him in moving his belongings, at times doing so in the middle of the night. For example, law enforcement surveilled KABLE and BERMUDEZ moving LORA between residences on August 11, 2024, including the transport of large black bins with yellow and red lids which contained controlled substances.

### V.    *Overdose Deaths Resulting from the Conspiracy*

20.    Law enforcement review of data seized relating to darknet market accounts and U.S. Postal Service services used in furtherance of the conspiracy revealed several fatal overdoses within days of receipt of packages.

21.    For example, on October 25, 2024, LORA was surveilled depositing 44 packages into the U.S. mail stream. Law enforcement seized 2 of these packages, which were found to contain methamphetamine and N-Pyrrolidino Etonitazene. The remaining 42 packages were photographed, and postage data was obtained for them, identifying one of the recipients as an individual, hereinafter "Victim 1, "who resided in Elgin, South Carolina. Victim 1 died approximately 6 days later, on or about October 31, 2024, from a mixed drug overdose. According to the report of postmortem examination, Victim 1 passed from acute mixed drug toxicity involving N-pyrrolidino etonitazene, butalbital, zopiclone, methocarbamol, mitragynine, and flualprozolam. Review of Victim 1's phone identified the TOR browser used to access the darkweb.

22.    Review of seized data relating to one of the Simplejack accounts used by the conspirators revealed that Simplejack had fulfilled at least five orders for a customer using the moniker CrookedFet. In particular, on August 6, 2022, Crookedfet placed an order for "x50Oxycodone M30 Mexican Supply SMOKEABLE." This order was the only one made by

8

CrookedFet on the market in August 2022. Six days later, an individual referred to herein as "Victim 2," the user of the CrookedFet account, was found deceased at his residence in Butte, Montana. Responding officers noted the presence of drugs, including a small zip-top bag containing approximately 25 blue M30 pills and several used syringes. The officers also noted an opened USPS envelope on the floor near the deceased addressed to Victim 2 bearing a return address in Burlington, MA and a torn, padded envelope. Lab testing of the counterfeit oxycodone pills found on the scene of the August 2022 overdose revealed the presence of Fentanyl, 4-ANPP, a fentanyl precursor, and acetaminophen. The Montana State medical examiner ruled Victim 2's death an accident, resulting from acute combined alprazolam, fentanyl and methadone intoxication. The Chief Medical Examiner for the State of Montana was further interviewed by law enforcement and stated that the fentanyl level in Victim 2's blood post autopsy was a "high" level of fentanyl, and that level alone would have killed Victim 2.

23.    The defendant agrees generally that the risk of death to customers from the conspiracy's activities was reasonably foreseeable to the defendant.

## VI.    *Manufacture of Counterfeit Pills by Coconspirators*

24.    The defendant's coconspirators manufactured their own counterfeit pills for distribution by the defendant and others. The counterfeit oxycodone pills were round, blue pills, debossed with an "M" on one side and "30" on the other. These markings were consistent with pharmaceutical oxycodone preparations, including that produced by Mallinckrodt Pharmaceuticals. The conspirators advertised these counterfeit oxycodone pills as "oxycodone M30 Pill *pressed*," among other descriptions. The pills however did not contain the active ingredients of the pharmaceutically manufactured drug, and instead contained differing controlled substances, depending on the batch. The majority of the conspirators' counterfeit oxycodone pills

9

seized by law enforcement contained a novel synthetic opioid, N-pyrrolidino etonitazene, commonly referred to as "pyro." Pyro was temporarily scheduled by the DEA on April 12, 2022, in Schedule I, and thereafter placed permanently in Schedule I on April 11, 2024. Studies have found that pyro is over 800 times more potent than morphine and 20-40 times more potent than fentanyl. Additional counterfeit oxycodone pills manufactured and distributed by the conspirators contained fentanyl and Xylazine.

25.    The counterfeit Adderall were round, orange pills, debossed with "A D" on one side and "3 | 0" on the other.  These markings were consistent with a pharmaceutical form of Adderall.  The pills however did not contain the active ingredients of the pharmaceutically manufactured drug, and instead contained methamphetamine.  The conspirators advertised these counterfeit pills as Adderall.

26.    The defendant was aware of the manufacture of significant quantities of counterfeit pills by his conspirators for distribution. For example, in December of 2024 the defendant was involved in the relocation of at least five industrial pill presses from a residence, where they had been used to manufacture counterfeit pills, to a storage unit. Between December 2024 and July of 2025, at the defendant's direction, BERMUDEZ rented and paid for a storage unit in his name, at which the five industrial pill presses, numerous pill press molds matching the imprint of counterfeit pills distributed by the conspirators, crystal methamphetamine, at least 41 kilograms of cutting agents, and other paraphernalia were stored. The cutting agents included at least 35 kilograms of blue powder, similar in color to the counterfeit oxycodone pills that the conspirators distributed. The defendant's primary purpose in obtaining and maintaining the storage unit was for the storage of these items used in furtherance of his drug trafficking conspiracy.

**VII.    *Law Enforcement Seizures***

27.    As set forth below, through controlled purchases, postal seizures, and seizures in the execution of search warrants, to date law enforcement has seized an estimated over 36 kilograms of counterfeit Adderall pills, 1.4 kilograms of counterfeit Oxycodone pills, and over 5 kilograms of counterfeit Xanax pills associated with distribution through the TEGRITYPHARMA darknet pages. Additional controlled purchases were made by law enforcement from the Simplejack page, which revealed the presence of methamphetamine, fentanyl, 4-ANPP, xylazine, fluorofentanyl, parafluorofentanyl, xylazine, and Bromazolam, among other substances, in the counterfeit pills distributed through that market vendor.

28.    Records and data from the defendant's conspiracy reveal additional quantities distributed nationwide.

29.    Between January 2024 and June 2025, law enforcement conducted approximately twenty controlled purchases from the TEGRITYPHARMA vendor page on Archetyp market, which were shipped to covert mailboxes within the Eastern District of Virginia and elsewhere. In total, law enforcement purchased and/or seized approximately 627 grams of green counterfeit Xanax pills, approximately 1.274 kilograms of counterfeit Adderall pills, and approximately 62 grams of blue, counterfeit oxycodone pills.

30.    On June 4, 2025, LORA  was arrested on a criminal complaint charging him with conspiring to distribute five hundred grams or more of a mixture and substance containing a detectable amount of methamphetamine. On the same date, a search warrant was executed at LORA 's residence. During the search of the LORA's residence, law enforcement seized a total of approximately 138,000 pills, including over 34 kilograms of counterfeit Adderall pills, over 4 kilograms of counterfeit Xanax pills, and over 1 kilogram of counterfeit oxycodone pills. These seized pills were being stored at LORA's residence, primarily in large black bins with yellow and

red lids, for him to later distribute in furtherance of the instant conspiracy. The seized pills were sent to the DEA Mid-Atlantic lab for testing, which revealed the presence of Methamphetamine, Fentanyl, Pyro, Xylazine and Bromazolam.

31.    LORA's residence further contained paraphernalia that he used to package and ship controlled substances, including USPS envelopes, bubble mailers, mylar bags, a printer, a heat sealer, and numerous postage labels. Postage labels found at the LORA's residence included one associated with a controlled purchase made by an undercover law enforcement officer.

32.    Following LORA's arrest in relation to the federal investigation, the defendant fled the United States to Thailand in an attempt to avoid prosecution and to frustrate and impede the ongoing investigation. In advance of his flight, the defendant further made materially false statements to federal officials. Among other things, the defendant caused the filing of an application for a U.S. passport containing false representations about the duration and destination of travel.

33.    This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

*(Continued on next page.)*

34.     The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

<div style="margin-left:40%">

Respectfully submitted,

Lindsey Halligan
United States Attorney and Special Attorney

Todd W. Blanche
Deputy Attorney General

Robert K. McBride
First Assistant United States Attorney

</div>

Date:   January 7, 2026

By:     _____
        Heather D. Call
        Christopher M. Carter
        Assistant United States Attorneys

13

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, Daniel John Blaney, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
DANIEL JOHN BLANEY

I am Elizabeth Lauren Van Pelt, defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Elizabeth Lauren Van Pelt
Frank Salvato
Counsel for the Defendant

14